GEORGE BACKER, INC., Individually on Its Own Behalf and as the Holder of Class B Common Stock of Textile Realty Corporation, Plaintiff, v. TEXTILE REALTY CORPORATION et al., Defendants.

Supreme Court, Special Term, New York County, June 11, 1948.

298

*Samuel I. Rosenman* and *Max Freund* for plaintiff.

*Hamilton C. Rickaby* and *Benjamin C. Milner* for Textile Realty Corporation and others, defendants.

*Holdeen, Elias & Holden* for Jonathan Holdeen, defendant.

*Solomon I. Sklar* and *Edward Weinfeld,* in person, for Edward Weinfeld, defendant.

SCHREIBER, J. Plaintiff is the holder of all the issued class B common stock of the corporate defendant Textile, and has a contract with Textile under which it may acquire the remainder of the authorized shares of that class. It seeks to enjoin Textile and its directors, the individual defendants herein (as well as Metropolitan Life Insurance Company, a prospective mortgagee), from consummating a proposed $3,500,000 first mortgage loan on the property of Textile, or any other similar first mortgage loan, and from other related acts.

There exists a mortgage on Textile's property securing an issue of bonds, made in 1944 and maturing in 1959, running to New York Trust Company, as trustee, on which there is an unpaid balance of $3,500,000; and the purpose of the proposed loan is, and of any similar first mortgage loan would be, to retire the existing bonds. In effect, therefore, plaintiff seeks a deter-

mination that the existing bonds may not, without its consent as owner of class B common shares, be retired by means of a refunding mortgage.

The complaint states two causes of action, the first alleged by the plaintiff on its own behalf, the second stated by it derivatively on behalf of Textile.

The ground of plaintiff's opposition to the proposed refinancing, as set forth in the first cause of action, may be simply stated. So long as the present mortgage continues in force, no dividends may under its terms be paid or accumulated on the preferred shares of Textile and all available income of Textile is devoted to the reduction of the mortgage, thus enhancing the value of Textile's equity in the property. If, however, the present mortgage is now replaced by another not containing similar restrictions, the income of Textile instead of being applied to the reduction of the mortgage may be paid (as dividends) to the preferred shares; and, to the extent that such dividends are not paid, the preferred shares will forthwith become entitled to accumulated dividends, all to the injury of the equity represented by the class B common shares now and prospectively owned by the plaintiff.

For an understanding of the somewhat unusual relationship between the several classes of Textile's securities, both shares and bonds, responsible for this situation, resort must be had not only to its certificate of incorporation but to the trust indenture covering the bonds, referred to in such certificate.

The certificate provides in pertinent part as follows:

" 3. The amount of the capital stock of the corporation shall be one hundred twenty-three thousand three hundred and forty-five dollars ($123,345) consisting of forty-one thousand one hundred and fifteen (41,115) shares of Preferred Stock of the par value of one dollar ($1.) per share, forty-one thousand one hundred fifteen (41,115) shares of Class A Common Stock of the par value of one dollar ($1.) per share, and forty-one thousand one hundred fifteen (41,115) shares of Class B Common Stock of the par value of one dollar ($1.) per share.

" 4. The designation, preference, privileges and voting powers, and the restrictions or qualifications of the shares of each class are as follows: * * *

" Commencing with the first day of the month following the month in which all outstanding First Mortgage Bonds of the corporation which may hereafter be issued under an Indenture to be made by the corporation with The New York Trust Company, as Trustee, dated September 1, 1944, in the aggregate

principal amount of four million one hundred eleven thousand and five hundred dollars ($4,111,500.) have been paid, or payment thereof has been provided for in accordance with said Indenture, (which day is hereinafter referred to as the ' Retirement Date ') the holders of the Preferred Stock shall be entitled to receive, when and as declared by the Board of Directors of the corporation, dividends from the net profits or surplus of the corporation, at the rate of six dollars ($6.) per share per annum and no more, * * *. Such dividends shall be cumulative from and after the Retirement Date.

" The Preferred Stock may, at any time after the Retirement Date, be redeemed in whole or in part at any time and from time to time at the option of the corporation by the payment in cash for each share of Preferred Stock so redeemed of sixty-six and two-third dollars ($66⅔) plus accrued dividends thereon to the date fixed for redemption * * *.

" In the event of any liquidation, dissolution or winding up of the affairs of the corporation, or any reduction of the capital stock resulting in a distribution of any assets to stockholders, the holders of the Preferred Stock shall be entitled to receive out of the assets (whether capital or surplus) of the corporation, for each share thereof, an amount equal to sixty-six and two-third dollars ($66⅔) per share plus accrued dividends thereon to the date fixed for the payment of such amount, before any distribution of the assets shall be made to the holders of the Class A Common Stock and Class B Common Stock of the corporation, and the holders of Preferred Stock shall be entitled to no further participation in such assets * * *.

" From and after the Retirement Date the corporation shall establish a sinking fund for the retirement of Preferred Stock by purchase on tenders or in the open market or by redemption but in no event at a price in excess of the redemption price * * *.

" So long as any shares of Preferred Stock shall be outstanding, no dividends or other distributions whatsoever shall be paid, declared or set apart for payment on the Class A Common Stock or Class B Common Stock and no such Common Stock shall be purchased or retired.

" From and after, and not before, the retirement or redemption of all the Preferred Stock, the Common Stock of both classes shall be entitled to such dividends, if any, out of the net profits or surplus of the corporation as from time to time may be declared by the Board of Directors of the corporation."

The certificate also provides that each preferred share shall have two votes, and each class A common share one vote; and that the class B common shares shall have no vote until after the retirement of all the preferred shares, whereupon each class B share is to have one vote.

The indenture referred to in the foregoing contains in pertinent part the following provisions:

" Article V. Sinking Fund

" Section 1. The Company shall establish and maintain a sinking fund   *   *   *   and shall deposit with the Trustee all its Available Net Income in each income period remaining after the payment of income interest on the Bonds   *   *   *.

" Section 2. The Trustee shall apply the moneys received by it   *   *   *   as soon as may be practicable to the purchase of Bonds, from time to time, in the discretion of the Trustee   *   *   *.

" Section 3. If the funds received by the Trustee   *   *   * have not been exhausted by the purchase of Bonds   *   *   * and if the amount of the funds on hand exceeds Fifteen Thousand Dollars ($15,000) such fund shall be issued by the Trustee for the redemption of Bonds on the next succeeding interest date   *   *   *.

" Section 4. All Bonds purchased or redeemed pursuant to the provisions of this Article V shall be cancelled   *   *   *   and no new Bonds shall be issued in lieu thereof."

" Article VIII. Operation and Management.   *   *   *

" Section 8. The Company shall not pay or declare any dividends or other distributions on or purchase or retire any shares of its Preferred Stock or class A or class B common stock until after all Bonds outstanding hereunder shall have been retired."

From a reading of these provisions it is apparent that as long as the present indenture remains in force class B common shares are assured by its provisions of the enhancement of the corporation's equity by the application of all available net income to the reduction of the mortgage, and are protected against any accumulation of arrears of dividends on the preferred shares which would increase the preferential claim of those shares. It is equally apparent that the substitution for the present indenture of a mortgage not containing provisions substantially identical with those of the present indenture in these respects would be gravely injurious to the value of the class B common shares.  In effect the question before the court is then whether the class B common shares have such a vested or contractual right in the maintenance of the quoted provisions of the inden-

ture as to prevent the replacement of that indenture, without the consent of the holders of those shares, by a mortgage not embodying these protective provisions.

In the absence of special agreement or special circumstances the rights attaching to particular classes of shares and the power of the directors to alter those rights, are determined by the certificate of incorporation, in which may be included, for the present purpose, the indenture referred to therein. There being in those instruments no express prohibition against a refunding mortgage as such, the court takes the view that such a mortgage, if it contained provisions affording the class B common shares identical protection with that afforded by the quoted provisions of the present mortgage indenture, would clearly be within the statutory power of the corporation to borrow money and mortgage its property (Stock Corporation Law, § 16).

However, the question whether it may make a mortgage *not* containing such provisions still remains to be answered.

Plaintiff calls attention to provisions of the indenture (art. XVIII, § 1), which specifically contemplate the satisfaction of the existing mortgage in case of the sale of the property, or the subordination of the existing mortgage to a new mortgage; and it points to the failure to include a refunding mortgage among the contingencies provided for as evidencing that that contingency was deliberately excluded because no power to make such mortgage was regarded as existing. The omission does not warrant so extreme an inference. It may be explained as due simply to a failure to appreciate the possibility that a situation might arise in which a refunding mortgage might be desired. Indeed, it seems safe to infer, from the instruments as a whole, that had that possibility been present to the framers of the corporate and debt structure, express and appropriate provision therefor would have been made not only at this point but at other points in the instruments.

Defendants on their side point to several provisions of the indenture in which, they allege, the power to make the proposed substitution of mortgages is clearly implied. The difficulty is that, at most, the provisions cited may be regarded as consistent with the power to make a refunding mortgage, but throws no light on the claimed power to omit from such mortgage the provisions protective of the plaintiff. Thus, a provision of the indenture upon which much stress is laid by the defendants is that giving Textile the right at any time to redeem " all or less than all of the bonds " by depositing the redemption price with the trustee (Indenture, art. VI, § 1). Inasmuch as Textile is

required by the sinking fund provisions of the indenture to pay over to the trustee annually its entire available income, it is difficult to divine from what source, if any, the framers of the indenture could have anticipated the funds for such redemption payment would come; and the defendants accordingly contend that the only possible source which they could have anticipated must have been a refunding loan. Even accepting that contention (though other possible sources of such funds may perhaps be suggested), the provision can hardly be said to call for the conclusion that in arranging such a refunding loan the corporation was empowered to disregard the rights of its class B common shares; and the same may be said of a provision from which the defendants would have the court infer a power to make a partial refunding mortgage — the provision of the indenture (art. XVIII, § 1), requiring the trustee to join in subordinating the indenture to the lien of a new mortgage loan.

One provision is indeed pointed to by defendants as clearly empowering the corporation to defeat the rights of the class B common shares. This is the power to sell the property, which necessarily includes the power to sell for a price sufficient only to redeem the bonds and the preferred shares, leaving the common shares, both class A and class B, without value. If it is urged, the directors have this power, a fortiori, they have the power to render the plaintiff's shares not valueless but of reduced value, by deferring the date of their participation in dividends and assets. The suggestion perhaps overlooks the fact that a sale of the property for less than the best price obtainable would constitute not an exercise, but an abuse of power. That consideration aside, however, the surface plausibility of this contention disappears when the essential difference between the two supposed situations is appreciated. Not less than two of the five directors are chosen by the holders of the class A common shares, and those shares represent not less than one third of the votes required by statute upon a sale of all the assets of the corporation. Moreover, as appears from the indenture, its execution and delivery were authorized by this court in order to carry out a plan of reorganization approved by the court (in a proceeding under the Burchill Act; Real Property Law, §§ 119–123). As further appears from the plan of reorganization and the indenture, the voting powers of the preferred and common shares are united in a single voting trust certificate; so that, at least so long as the voting trust agreement remains in force, the voting power of the preferred and of the class A common shares is in the same hands. Moreover, under

the plan of reorganization, neither preferred nor class A common shares were issued independently; instead each former bondholder received a unit composed of one bond, a certain number of preferred shares, and a certain number of class A common shares, the whole transferable only as a unit until the bond is redeemed, when for the first time the preferred and class A common shares become separable; so that, even after the expiration of the voting trust agreement, the preferred and class A common shares remain united in ownership except so far as the bonds have been redeemed. Under these circumstances it is virtually impossible to suppose a situation in which the directors and voting trustees would in disregard of the interests of the class A shares, content themselves with selling for a price merely sufficient to redeem the preferred shares. On the contrary, they would seek to obtain for the property as great a price as possible *in excess of* the aggregate of the bonds and preferred shares; since at least one half such excess would go to the class A common shares (all of which have been issued), the remainder going to the class B common. As to a sale, therefore, there is no adversity of interest between the holders of class B shares and the security holders represented by the defendants. As sharers in the excess received upon a sale they are allied in interest; and such community of interest affords the class B shares full protection. No such community of interest exists, and hence no analogous inherent protection is to be found, in connection with the exercise of the power claimed by defendants to divert to the preferred shares corporate income now pledged to reduction of the mortgage, and to build up for the preferred shares accumulated arrears of dividends, to the detriment of the class B common shares, by the mere substitution of a new mortgage lien for the existing one.

It thus appears that the power to make a refunding loan being assumed, no provision of the instruments whether expressly or by implication warrants the exercise of that power in a manner calculated to work irreparable injury to the class B shares; and such, the court holds, would be the effect of substituting for the present indenture a new mortgage not embodying equivalent protection for those shares in the respects mentioned. A court of equity may not, in the absence of language clearly compelling such a result, permit the defendants to act upon a construction of their powers so clearly inequitable to the plaintiff.

Since the corporate structure and the debt structure under consideration are the outcome, as already indicated, of a plan of reorganization approved by the court, it is proper to consider

whether the conclusions just reached solely from the incorporation certificate and the indenture require modification in the light of the reorganization plan as a whole.

The plan of reorganization, approved March 9, 1944, provides that each holder of the then existing mortgage bonds shall receive, for each $1,000 of such bonds, a new bond in the amount of $600, preferred shares of the redemption and preferential claim value of $400 (6 shares at $66⅔ each) and 10 shares of class A common stock (such preferred and common shares to be deposited, however, under a five-year renewable voting trust agreement also provided for by the plan, the voting trust certificate representing such shares, as already indicated to be attached to the bond).

The plan also provided for the execution of a ten-year management agreement between the corporation to be formed and the plaintiff; and it was under the terms of that agreement, as thereafter entered into pursuant to the plan, that the plaintiff has acquired the 12,334½ shares of class B common stock now held by it and has the right, under certain conditions, to acquire the remainder of the authorized shares of that class. Under that agreement the plaintiff, for managing the property, receives each year from Textile, in addition to commissions on rentals "as additional compensation" 4,111½ shares of its class B common stock (10% of the total authorized class B common shares of Textile) provided the net earnings of the property for that year equal or exceed $250,000 (or in default thereof, the plaintiff pays the amount by which the net earnings fall short of that sum). Should the management contract not be previously terminated pursuant to its provisions, and should the plaintiff acquire in each year the shares provided, it will at the expiration of the contract be the owner of all the shares of class B. Should the property be sold before the expiration of the ten-year period for a sum in excess of the aggregate bonds and preferred shares outstanding, the plaintiff is thereupon to receive forthwith class B shares earnable during the unexpired period.

The plan thus contemplated that the class B shares might be acquired with or without cash payment, depending upon the annual earnings of the property. For the shares thus far acquired by the plaintiff, it has in fact paid nothing in cash. The proposed financing affects equally the shares already acquired and those which may hereafter be acquired, whether with or without cash payment. The rights inherent in these shares cannot vary according as their acquisition may or may

not have involved a cash payment. The suggestion of counsel for Textile that the interest of the class B shares, because they represent no investment in the property, may properly be sacrificed to those of the other classes of security holders cannot therefore receive acquiescence.

But in construing the instruments, the defendants urge, it must be borne in mind that in approving the plan of reorganization the court was concerned solely with the interests of the then bondholders and had no purpose to protect the plaintiff. Hence, it is urged, the circumstance that the construction of the instruments contended for may prejudice the value of the class B shares which plaintiff has acquired or may become entitled to acquire under its management contract must in effect be disregarded by the court, so long as such construction permits action which is, as the contemplated action manifestly is, for the benefit of the former bondholders who (or whose successors in interest) hold the present bonds and preferred stock.

That the plan of reorganization was intended solely for the benefit of the former bondholders is indisputable. But the management contract was as much a part of the plan of reorganization as was any of the other instruments, and it too must, therefore, be regarded as having been intended for the benefit of the bondholders. Indeed, the records of the reorganization proceeding disclose that the court was reluctant to approve this feature of the plan, although recommended by the referee, until thoroughly satisfied that it was beneficial to the bondholders, remitting the matter to the referee for further report and thereafter rendering an opinion expressly resolving the question of benefit to the bondholders in the affirmative. The essential feature of the management agreement, and the only feature which warranted its inclusion in the plan, is the provision for the issue of class B shares to the plaintiff; and it must be assumed that in approving the plan the court regarded as beneficial to the bondholders the incentive thus given to the plaintiff as managing agent of the property through its opportunity to acquire such shares. Correspondingly, a construction of the plan that would sustain the plaintiff's right to protect the value of such shares by insisting on adherence to the scheme of application of income laid down in the plan may also be regarded as beneficial to the bondholders.

Thus, from a review of the plan of reorganization as a whole, and of the proceedings which resulted in that plan, the conclusion emerges that the protection of the value of the class B common shares was an integral part of the plan, and the con-

clusion already reached, that those shares have a contractual interest in the preservation of the relevant provisions of the indenture, receives reinforcement.

The relief asked for by the plaintiff under its first cause of action must be granted to the extent of enjoining the satisfaction of the existing mortgage on the defendant Textile's property out of the proceeds of any new mortgage not containing provisions substantially the same as are contained in the existing indenture, requiring the application of the available net income of the corporation to the reduction of such mortgage and prohibiting the declaration or payment of dividends on the preferred stock until the retirement of the obligation secured by such mortgage. The defendant, Metropolitan, has moved separately for a dismissal of the complaint as to it; the motion is granted and the complaint is dismissed.

Under the order of the court approving the plan of reorganization, the court reserved jurisdiction over the proceeding until the ultimate consummation of any action contemplated or provided for in the plan. Whether under such reservation of jurisdiction or under such supervisory power over the defendant Textile as the court which approved the plan of reorganization may have under the Streit Act (Real Property Law, art. 4-A), that court may modify or amplify the certificate of incorporation or the indenture in the light of the situation responsible for this litigation, the court is here not called upon to decide. The relief now granted, however, will be without prejudice to the right of the defendants to make such application to that court as defendants may be advised.

Under its second cause of action the plaintiff, on behalf of Textile, attacks the proposed mortgage as improvident and burdensome, and as motivated, on the part of the three defendant directors who are holders of bonds and preferred shares, by self-interest rather than by the interest of the corporation. It is elementary that the mere ownership by directors of shares of the corporation furnishes no ground for an attack on the good faith of their acts on behalf of the corporation, their self-interest and that of the other stockholders being identical; and in the circumstances of the present case, the ownership of the corporation's bonds is in effect analogous to the ownership of stock. It is equally elementary that the financial desirability of a proposed corporate transaction is, in the absence of a showing of bad faith, exclusively for the directors and not for the courts. As to the second cause of action the complaint must therefore be dismissed.

Settle decision and judgment on notice in accordance herewith.